IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Betty B. Thompson, | ) | Civil Action No. 8:09-01968-JFA-BHH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Michael J. Astrue, | ) | **OF MAGISTRATE JUDGE** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case is before the Court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, § 636(b)(1)(B).[1]

The plaintiff, Betty B. Thompson, brought this action pursuant to §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)[2]), to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") regarding her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act, as amended (the "Act").

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

The plaintiff was born on November 6, 1949 (*see* R. at 159), and thus was 59 years old at the time of the ALJ's decision. She alleges that she became disabled on December 15, 2006, due to back surgery, arthritis, high blood pressure, diabetes, high cholesterol and a heart condition. (R. at 164.) She has a high school education (*see* R. at 170), and past work experience which includes work as a telemarketer (R. at 28; *see also* R. at 60).

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] 42 U.S.C. § 1383(c)(3) "incorporates the review provisions of 42 U.S.C. § 405(g)." Melkonyan v. Sullivan, 501 U.S. 89, 92 (1991).

The plaintiff protectively filed applications for DIB and SSI on September 12, 2007 (R. at 121, 127, 160.) After her applications were denied in initial and reconsidered determinations (R. at 66-69), she requested a hearing before an Administrative Law Judge ("ALJ") (R. at 89). On February 13, 2009, the ALJ conducted a *de novo* hearing at which the plaintiff, her legal counsel and a vocational expert appeared. (R. at 16.) By decision dated April 29, 2009, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (R. at 7.) After the Appeals Council denied the plaintiff's request for review on June 10, 2009 (R. at 1), the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)　The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

> (2)　There is no evidence in the record that the claimant has engaged in any substantial gainful activity since December 15, 2006, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

> (3)　The claimant has the following severe impairments: status post decompressive lumbar laminectomy and discectomy, back pain, right radicular leg pain, diabetes, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

> (4)　The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

> (5)　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). However, due to her impairments and complaints she must be allowed a sit/stand option.

> (6)　The claimant is capable of performing past relevant work as a telemarketer. This work does not require the performance

2

of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(7)     The claimant has not been under a disability, as defined in the Social Security Act, at any time from December 15, 2006, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

## APPLICABLE LAW

The Act provides that DIB[3] shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Administration's official Listing of Impairments found at 20 C.F.R. part 4, subpart P, appendix 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920.[4] If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.*; *see also Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

---

[3] Eligibility requirements for SSI differ, *see* 42 U.S.C. § 1382, but are not an issue in the case *sub judice*.

[4] All of this Court's regulatory references are to the 2009 version of the Code of Federal Regulations (C.F.R.).

3

performed the work. Social Security Ruling (SSR) 82–61, *1983-1992 Soc. Sec. Rep. Serv*. 836 (West 1992) [hereinafter *SSRS*]. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5)(a); *see also id*. § 1382c(a)(3)(H)(i). He must make a prima facie showing of disability by showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.* at 191-92.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389 (1971). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing* U.S.C. § 405(g)*; Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

The plaintiff contends that the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) several aspects of his analysis at step four of the sequential evaluation; (2) failing to give controlling weight to the opinion of one of his treating physicians; and (3) failing to properly analyze the plaintiff's credibility. The Court will address each allegation in turn.

### I. Step Four Analysis

A. SSR 82-62: The plaintiff contends that the ALJ erred in finding, at step four of the sequential evaluation process, that she can perform her past relevant work ("PRW") as a telemarketer. The Commissioner's Ruling 82-62 provides that,

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision *must* contain among the findings the following specific findings of fact:
> 1. A finding of fact as to the individual's [residual functional capacity].
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
> 3. A finding of fact that the individual's [residual functional capacity] would permit a return to his or her past job or occupation.

SSR 82-62, *in SSRS*, *supra*, 809, 813 (emphasis added).

As set out above, the ALJ found that the plaintiff retained the residual functional capacity ("RFC") to perform "sedentary work."[5] (R. at 11.) He also stated that the plaintiff's

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

PRW as a telemarketer did "not require the performance of work-related activities precluded by" her RFC. (R. at 14.) The ALJ explained that he had compared the plaintiff's RFC with the physical and mental demands of her PRW. Although not set out as a "finding of fact," the ALJ also addressed the second criterion. He referred to the testimony of the vocational expert ("VE")[6] that the plaintiff's PRW was sedentary work with an "SVP of 3,"[7] which allowed the worker "to sit or stand as long as productivity was maintained." (*Id.*)

B. SSR 00-4p: The plaintiff complains that the ALJ erred in relying on the VE's testimony because the ALJ's hypothetical contained nonexertional impairments not included in the telemarketer description given in the *Dictionary of Occupational Titles* [hereinafter *DOT* (*see supra* note 7)]. At step four of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). To

---

20 C.F.R. §§ 404.1567(a), 416.967(a).

[6] The plaintiff refers to the "requirement" of Ruling 82-62 that "the ALJ make the necessary findings in regard to past work, and not simply rely on vocational testimony" (Pl.'s Br. 23), but the Ruling recognizes that determination of the claimant's ability to do PRW may require "supplementary or corroborative information from other sources," *SSRS*, *supra*, at 811-12. *See also* SSR 82-61, *SSRS*, *supra*, 836, 838 (in determining PRW characteristics, "it may be necessary to utilize the services of a [VE]").

[7]    [T]he Dictionary of Occupational Titles (DOT), [is] a Labor Department guide to job ability levels that has been approved for use in Social Security cases. *See* 20 C.F.R. § 404.1566(d)(1); *see also Porch v. Chater*, 115 F.3d 567, 571 (8th Cir. 1997). The DOT is the Commissioner's primary source of reliable job information. *See* 20 C.F.R. § 404.1566(d)(1). The Commissioner uses the DOT to classify occupations as skilled, semiskilled or unskilled. *See* 20 C.F.R. § 404.1569.

          In the DOT, each job is assigned a number that reflects the job's specific vocational preparation time (SVP), i.e., how long it generally takes to learn the job. *See* United States Dep't of Labor, Employment and Training Admin., *Dictionary of Occupational Titles*, Vol. II, Appendix C at 1009. An SVP level of "three" indicates that a job requires more than one month and up to three months of training; while an SVP level of "four" would require more than three months and up to six months of training. *See id.* at 1009. Unskilled work, on the other hand, requires less than thirty days training. 20 C.F.R. § 404.1569(a); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00. Unskilled work corresponds to an SVP of one or two in the DOT. *See* DOT at 1009.

*Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

meet this requirement, the ALJ may take administrative notice of information available in publications such as the *DOT* or, when faced with complex issues, consult with a VE or other specialist. 20 C.F.R. §§ 404.1566(d), (e), 416.966(d), (e). *See also Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

Occupational evidence provided by a VE generally should be consistent with that in the *DOT*. But the Commissioner has acknowledged, in Ruling 00-4p, 65 Fed. Reg. 75,759-01, that neither the *DOT* nor the VE's testimony "automatically 'trumps' when there is a conflict." *Id.* at 75,760. "[I]nstead, the ALJ is obligated to resolve the conflict by deciding if the [VE]'s explanation for the conflict is reasonable." *Fisher v. Barnhart*, 181 Fed. App'x 359, 365 (4th Cir. 2006).

Ruling 00-4p explains:

When there is an apparent unresolved conflict between [VE] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the [VE] evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the [VE] is reasonable and provides a basis for relying on the [VE] testimony rather than on the DOT information.

65 Fed. Reg. at 75,760. Accordingly, the ALJ must elicit a reasonable explanation for any "apparent unresolved conflict" between the VE evidence and the *DOT* before relying on the VE to support a determination about whether the claimant can perform such work. *See id.* "Reasonable explanation" may be based on, *inter alia*, "other reliable publications" or the VE's own "experience in job placement or career counseling." *Id.*; *see also Fisher*, 181 F. App'x at 365.

Admittedly, the ALJ violated SSR 00-4p because he failed to ask the VE if there was any conflict between his testimony and the *DOT* – even if there was none apparent. And, indeed, there *could* be no apparent conflict as the *DOT* does not discuss the availability of

a sit/stand option. The common definition of "to conflict" is "to show antagonism or irreconcilability." *Merriam-Webster's Online Dictionary*, http://www.merriam-webster.com/ dictionary/conflict (last visited May 21, 2010). Because the *DOT* does not address the availability of a sit/stand option, it was perforce not irreconcilable with the VE's testimony. *See Zblewski v. Astrue*, 302 Fed. App'x 488, 494 (7th Cir. 2008) ("Because the DOT does not address the subject of sit/stand options, it is not apparent that the [sit/stand] testimony conflicts with the DOT."); *Corbett v. Barnhart*, No. 1:04cv241, 2006 WL 5527015, at *62 (N.D. W. Va. Mar. 24, 2006) (finding that "the lack of a sit-stand option in the DOT does not conflict with the VE's testimony that certain jobs would be available with a sit-stand option in the national economy"); *Melvin v. Astrue*, No. 1:08CV264-SAA, 2010 WL 908495, at *4 (N.D. Miss. Mar. 9, 2010) ("That the DOT does not specifically describe a 'sit/stand option' does not necessarily create in inherent conflict"; thus, ALJ properly relied on VE's testimony).

The *DOT* itself acknowledges that its information "reflects jobs as they have been found to occur, but they may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. *DOT users demanding specific job requirements should supplement this data with local information detailing jobs within their community." DOT* at xiii (emphasis added). Even Ruling 00-4p counsels that the *DOT* "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." 65 Fed. Reg. at 75,760. Thus, it advises reference to a VE "or other reliable source of occupational information" for "more specific information about jobs or occupations than the DOT." *Id.*; *see also Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) (noting that "the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation"). As so eloquently expressed by the Tenth Circuit: "Indeed, what would be the point of vocational testimony (or expert testimony in general) if it could not reach beyond

matters already established through administrative (or judicial) notice?" *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993). Because there was no conflict, no duty of explanation ever arose; hence, any such oversight was harmless.[8] *See Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (holding that the ALJ's failure to ask the VE about possible conflicts was "harmless, since no such conflict appears to exist"); *Massachi v. Astrue*, 486 F.3d 1149, 1154 & n.19 (9th Cir. 2007) (failure to follow SSR 00-4p would have been harmless if there had been no conflict between VE's testimony and *DOT* ).

C. SSR 96-9p: The plaintiff also contends that the ALJ erred in not providing in his hypothetical a more specific assessment of her ability to sit and stand and not specifying how frequently she would need to exercise her sit/stand option, relying on Ruling 96-9p, 61 Fed. Reg. 34,478-01:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. *The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.* It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

*Id.* at 34,482 (emphasis added).

There are a number of reasons, however, for why Ruling 96-9p is not applicable to the plaintiff's case. In its "Introduction," the Ruling explains the adjudicator's duty at step

---

[8] The Court notes that the plaintiff was given an opportunity to cross-examine the VE, and that she failed to explore any possible conflict upon cross-examination. (*See* R. at 61-62; *see also id.* at 61 ("Counsel, you can question [the VE] or pose your own hypothetical.").) Thus, the administrative record contains *no* evidence that the VE testimony and the *DOT* are in conflict.

five with reference to "[t]he rules of appendix 2 of subpart P of Regulations No. 4" - namely, the "Grids."[9]  The ALJ did not decide the plaintiff's case in reliance on the Grids.

The Ruling goes on to specify that "[t]he impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50"; the plaintiff is over the age of 50.  It continues:

> Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.  On the other hand, since the rules in Table No. 1 of [the Grids] direct a decision of "disabled" for individuals age 50 and over who are limited to a full range of sedentary work, *unless the individual has transferable skills or education that provides for direct entry into skilled sedentary work*, the impact of an RFC for less than the full range of sedentary work in such individuals is less critical.

*Id.* at 34,479-80 (footnote omitted; emphasis added).  Of course, the ALJ here found that the plaintiff's RFC would allow her to return to her previous "skilled sedentary work."

Lastly, that portion of Ruling 96-9p upon which the plaintiff relies is one of several sections which "provide adjudicative guidance as to the impact of various RFC limitations and restrictions on the *unskilled sedentary occupational base*."  *Id.* at 34,481 (emphasis added).  *Cf. id.* at 34,482 (Where a sit/stand option is needed, "the occupational base for a full range of unskilled sedentary work will be eroded.").  As the plaintiff's case was not decided with regard to the "unskilled sedentary occupational base," there was no reason to apply that section to her case.

In a word, there is no indication that Ruling 96-9p applies to a step-four analysis. Indeed, the passage of the Ruling on which the plaintiff relies provides, "The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.  It may be especially useful in these situations to consult a vocational

---

[9]  The Grids provide a factfinder with administrative notice of classes of jobs available in the national economy for persons who have, among other things, certain disability characteristics such as strength or exertional limitations.  *See* 20 C.F.R. pt. 404, subpt. P., app. 2 §§ 200.00-204.00.

resource in order to determine *whether the individual is able to make an adjustment to other work."* 61 Fed. Reg. at 34,482 (emphasis added). "[W]hether the individual is able to make an adjustment to other work" *is* the Commissioner's step five burden.

Moreover, the "Plaintiff wants the ALJ to provide more specificity in his decision than Plaintiff has been able to provide herself." *Torres v. Astrue*, No. 0:07-2865-PMD-PJG, 2009 WL 873995, *9 (D.S.C. Mar. 30, 2009). The plaintiff's medical records fail to indicate that she needed to alternate sitting and standing, much less according to a certain schedule. The consultative examiner failed to specify a sit/stand schedule (*see* Tr. 305-06), and the VE did not indicate that such a schedule was necessary to determine whether the hypothetical claimant could perform the plaintiff's PRW. Thus, there is no evidence that the plaintiff must alternate positions at particular intervals, no evidence that such a schedule is required, and no showing that the plaintiff suffered any harm from its absence.

Ultimately, however, the issue boils down to common sense:

> Although the ALJ failed to specify the frequency that [the plaintiff] needed to change [her] sit/stand position, the reasonable implication of the ALJ's description was that the sit/stand option would be at [the plaintiff]'s own volition. This implication satisfies [the plaintiff]'s needs. In addition, [the plaintiff] failed to offer any evidence that [s]he could not perform the unskilled jobs identified by the vocational expert based on [her] ability to sit or stand for any period of time. This failure prohibits [the plaintiff] from establishing [her step four] burden of [her] inability to perform the identified jobs.

*Williams v. Barnhart*, 140 F. App'x 932, 937 (11th Cir. 2005). *See also Foster v. Astrue*, No. 3:08-cv-960-J-12HTS, 2009 WL 4757239, *2 (M.D. Fla. Dec. 10, 2009) ("[C]ommon sense reading of the ALJ's RFC finding and hypothetical question to the [VE] is that the ALJ contemplated a sit/stand option at will[.]"). Clearly, the Court finds no contestable claim in the plaintiff's argument.

D. The Plaintiff's Mental RFC: The plaintiff next complains that the ALJ erred in relying upon the VE's testimony as the ALJ found that the plaintiff "would be limited to unskilled, simple work, due to moderate difficulties with concentration, persistence, and

pace." (Pl.'s Br. 23.) For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979). Yet the hypothetical posed to the VE need only reflect those impairments supported by the record. *See Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000); *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993).

The ALJ did not err, however, because he never found these limitations; the plaintiff has mis-read the decision. As stated hereinbefore, the ALJ found the plaintiff's RFC limited only to the performance of "sedentary work . . . . However, due to her impairments and complaints she must be allowed a sit/stand option." (R. at 11.) In other words, the ALJ found that the plaintiff suffered from physical, and no mental, restrictions.

The passage to which the plaintiff refers is the ALJ's analysis of the "Psychiatric Review Technique." The Commissioner set out "the technique" in 20 C.F.R. §§ 404.1520a(b) and 416.920a(b):

> [These regulations] explain that we must first evaluate the evidence to determine whether an individual has a medically determinable mental impairment(s), demonstrated by pertinent symptoms, signs, and laboratory findings. If we determine that an individual has a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings substantiating its presence. Then, we will rate the degree of functional limitation resulting from that impairment(s) and record our findings as set out in §§ 404.1520a(c) and (e) and 416.920a(c) and (e).

*Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746-01, 50,747 (Aug. 21, 2000). The regulations next provide that, if the claimant is found to have a severe impairment, but such impairment does not meet or equal a listing, the Administration will perform an RFC assessment. *Id.* at 50,747-48 (citing 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3)).

In implementing the technique, the adjudicator considers four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* at 50,748 (citing 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3)). In the plaintiff's case, the ALJ referred to her "Initial Clinical Assessment," conducted at the Catawba Mental Health Center on July 28, 2008,[10] for his observations that: "*With regard to concentration, persistence or pace*, the claimant has moderate difficulties. In the mental health assessment, her thought processes were normal, appropriate, coherent and relevant. The claimant was able to make sound decisions. Her memory was intact, but she was easily distracted." (R. at 11.) This information is provided in support of his finding that the plaintiff did not "meet" a mental health Listing. (*See* R. at 10-11 (explaining that, to meet the "paragraph B" criteria, the mental impairments must result in at least two of the functional limitations being "marked" or in repeated extended episodes of decompensation).) This was the plaintiff's severity rating, as explained by the ALJ: "The limitations identified in the 'paragraph B' criteria are not [an RFC] assessment but are used to rate the severity of mental impairments[.]" (R. at 11.)

The ALJ added that the mental RFC evaluation "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B," citing to Ruling 96-8p, 61 Fed. Reg. 34,474-01. (R. at 11.) Significantly, this Ruling specifies that the RFC assessment for nonexertional impairments, as with exertional

---

[10] The ALJ cites this Assessment at "Exhibit 11F, pg. 11," when it appears in the administrative record at Exhibit *15*F, page 11. (*See* R. at 333.)

impairments, "must be expressed in terms of work-related functions." 61 Fed. Reg. at 34,477. For mental impairments, these include the abilities to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.*

The ALJ's RFC analysis immediately follows his RFC finding, and includes his discussion of the plaintiff's mental health treatment and apparent functioning. (*See* R. at 12-14.) He concluded that her "depression and anxiety *do not interfere with* her ability to *understand, carry out, and remember simple instructions, use judgment, respond appropriately to supervisors, co-workers, and usual work situations, or deal with changes in a routine work setting*" (R. at 13 (emphases added)) – clearly setting forth the mental RFC assessment. As the ALJ's analysis was proper and resulted in a finding that was supported by substantial evidence, there was no error in his hypothetical to the VE.

Moreover, as the defendant points out, the plaintiff's mental impairments fail to meet the twelve-month durational requirement.[11] The plaintiff failed to mention any mental health impairment, limitation, symptom or treatment on any of her Disability Reports (*see* R. at 164, 190, 200), to the state disability examiner (*see* R. at 305), or to her treating physicians. The plaintiff did not seek mental health treatment until July 2008 and, by that December, she was discharged to her primary care physician for the prescribing of her medication. (*See* R. at 324.)

E. The VE's Role: The plaintiff appears to argue that the ALJ had the VE to determine that she could return to her PRW. This is simply not the case. When the ALJ

---

[11] "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. §§ 404.1509, 416.909. *See also* 42 U.S.C. § 423(d)(1)(A) (the durational requirement is a continuous period of impairment of not less than 12 months). *Cf. id.* § 1382c(a)(3)(A).

called the VE to testify, he first asked the VE to describe "the nature" of the plaintiff's PRW. (R. at 60.) The VE answered that the plaintiff's PRW was as a telemarketer, classified by the *DOT* as semi-skilled work, "generally performed at the sedentary exertional level." (*Id.*) The ALJ wanted to know if this position was the only PRW that was sedentary, and the VE answered affirmatively.

The ALJ next asked if this job would allow the plaintiff "to sit or stand while performing the work?" (*Id.*) The VE answered yes, assuming that the individual maintained productivity and stayed on task. The ALJ emphasized that he was interested only in the telemarketer job because of the plaintiff's back and leg complaints and her assertion that she could not stand for long. (R. at 61.) That was the extent of the ALJ's examination of the VE. At no time did the VE testify that *the plaintiff* could perform her PRW as a telemarketer. And the regulations approve of this use of VEs, advising that "[w]e may use the services of [VEs] . . . to obtain evidence we need *to help us determine* whether you can do your [PRW], given your [RFC]."[12] 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (emphasis added). Specifically, they provide that a VE

> may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

*Id.* This is exactly what took place in the plaintiff's case. Accordingly, there is no error.

F. The Plaintiff's Testimony: Returning to Ruling 82-62, the plaintiff complains that the ALJ failed to address her reasons for being unable to perform her past work. The plaintiff testified that the "number one problem" that kept her from working was her back. (R. at 41.) She said that she had attempted sedentary work but sitting was painful. (R. at

---

[12] The plaintiff contends that this Court has held "in recent unpublished decisions" that the ALJ may not rely solely on vocational testimony at step four. (Pl.'s Br. 23.) As the plaintiff has failed to provide citations or even case numbers for such decisions, or attach them to her Brief, the Court cannot address this claim. *Cf.* Fed. R. App. P. 32.1(b) (providing for filing and service of a copy of an unpublished opinion).

52.) The ALJ acknowledged the plaintiff's testimony that "standing gives her back pain," but reasoned that her complaints were "not credible to the extent they are inconsistent with" his RFC finding[13] (R. at 12), which, of course, includes a sit/stand option. Thus, the ALJ did address the plaintiff's reasons for being unable to perform her PRW.

G. Requirements of PRW: The plaintiff asserts that the ALJ failed to make specific findings as to the requirements of her PRW but, as explained above, the ALJ did so. The plaintiff repeats that the ALJ found that she was restricted to "simple instruction tasks" and her PRW was semi-skilled. (Pl.'s Br. 25.) But, as also discussed above, the ALJ did not find that the plaintiff's mental RFC was limited.

## II.    Medical Source Opinions

The plaintiff alleges that the ALJ erred in not giving "controlling weight" to the opinion of her physician, Dr. Richard Hughes, that she is "permanently and totally disabled." (R. at 354).    Administration regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), but the opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, *see id.* §§ 404.1527(d)(2), 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  *Mastro*, 270 F.3d at 178 (*citing Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

---

[13]  The plaintiff's objections to the ALJ's credibility finding will be addressed *infra.*

A "medical opinion" is a "judgment[ ] about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions, but rather, are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 61 Fed. Reg. 34,471-01, 34,474. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supports the decision. *See Blalock*, 483 F.2d at 775.

The plaintiff's first record from The Good Samaritan Medical Clinic is dated July 10, 2008 (*see* R. at 348); her most recent medical treatment had occurred on September 26, 2007. When the plaintiff first saw Dr. Hughes, on August 27, 2008, he noted her "multiple problems," and referred her to physical therapy for her back (R. at 345); this was his only mention of the plaintiff's back difficulties. Dr. Hughes also saw the plaintiff every month thereafter in 2008, attempting initially to regulate her blood sugar and, then, her blood pressure. (*See* R. at 337, 340-43.)

Five months after his first visit with the plaintiff, Dr. Hughes wrote a letter on her behalf which stated, in relevant part:

> Ms. Thompson has multiple medical conditions that have caused her to become permanently and totally disabled. She has diabetes mellitus, hypertension, and ruptured disks causing chronic back pain.
>
> It is my medical opinion that this is a permanent situation and will not change in the future. Ms. Thompson's ability to perform everyday activities has been drastically compromised and she will never be able to perform substantial gainful activity because of her condition.

(R. at 354.) The ALJ noted that he had considered Dr. Hughes's opinion and that the doctor had opined as to issues – the plaintiff's RFC and whether she is "disabled" –

17

reserved to the Commissioner. (R. at 13 (citing SSR 96-5p).) Consequently, he was assigning greater weight to the opinions of the state agency medical consultants "in that the claimant has no evidence of any impairment severe enough to prevent her from performing all types of work activity." (R. at 13-14.)

The plaintiff first objects to "the ALJ's dismissal of the opinion on the basis that he does not have to consider a general opinion of disability," because Dr. Hughes's opinion provided "more than just a general statement that she was unable to work." (Pl.'s Br. 27.) But it appears that the plaintiff has again misapprehended[14] the ALJ's decision. To the Court's reading, the ALJ "dismissed" the opinion because (1) Dr. Hughes opined on issues whose decision is reserved to the Commissioner and (2) *the plaintiff* has failed to provide evidence that she is unable to engage in any substantial gainful activity. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (definition of disability). Because the ALJ did *not* "determine[] that Dr. Hughes['s] opinion was not specific enough," he was under no obligation to recontact the doctor "'to determine whether the additional information [needed] is readily available.'" (Pl.'s Br. 38 (quoting 20 C.F.R §§ 404.1512(e)(1), 416.912(e)(1)).) Nevertheless, the plaintiff's attempt to support the doctor's opinion with his statement that "her ability to perform everyday activities has been drastically compromised" fails as it is no more explanatory than saying that she is disabled; the statement does not explain *how* the plaintiff's abilities have been compromised.

The plaintiff further relies on 20 C.F.R. § 404.1527(c)(3) which provides that:

> If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact

---

[14] The plaintiff also argues that the ALJ exercised "an expertise he does not possess" in finding that "Dr. Hughes's opinion was contradicted by the clinical and diagnostic findings." (Pl.'s Br. 32-33.) *See, e.g.*, *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."). But this is yet another finding that the ALJ did not make.

your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.

*Id.*; *see also* 20 C.F.R. § 416.927(c)(3). The ALJ, however, did not find that there was insufficient evidence upon which to make the disability decision but, rather, that the plaintiff had failed to provide sufficient evidence that she was disabled, *i.e.*, that the (sufficient) evidence failed to show that she was disabled. Nor, clearly, did the ALJ conclude that he could not reach a decision. Hence, this regulation is inapposite to the plaintiff's case.[15]

The plaintiff counters that she provided evidence of a disabling impairment to include a lumbosacral myelogram with the following showings: moderate central canal stenosis at L4-5 and L3-4 with compression on the descending right L5 nerve root and right L4 nerve roots, and posterior osteophyte/disc complex at L1-2 producing moderate indentation on the anterior aspect of the contrast column. (R. at 218.) She further refers to a magnetic resonance image ("MRI") which appeared to show a transitional L5 segment and a broad-based disc protrusion at three levels. (R. at 233.) The MRI indicated facet degenerative changes, canal stenosis at L3-4 and L4-5, and also at L4-5, right neural foraminal narrowing and lateral recess narrowing. (R. at 233-34.) But contrary to the plaintiff's statements, the ALJ discussed these findings. (R. at 10.)

Moreover, the myelogram was produced on December 18, 2006, and the MRI on December 5, 2006, but on December 19, 2006, the plaintiff underwent a decompressive lumbar laminectomy at L3-4 and L4-5 with an L4-5 discectomy on the right. (R. at 221.) The plaintiff's surgeon, Dr. Daniel Burrus, reported that he successfully freed both the L4 and the L5 roots and decompressed the lateral recess, especially where the plaintiff had significant stenosis. (R. at 221-22.)

---

[15] Of course, per the terms of 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3), the state agency did have the plaintiff undergo a consultative examination (*see* R. at 305), and the plaintiff was "ask[ed] ... for more information" at her hearing.

As the ALJ summarized (R. at 12), the plaintiff experienced improvement of her pain after this surgery. At her first post-operative visit, the plaintiff reported that overall, she was better, and Dr. Burrus observed that she appeared to be in much less pain and was ambulating reasonably well. (R. at 266.) Eight weeks out, on February 14, 2007, the plaintiff's right radicular leg pain was improved, but she described "severe back pain." (R. at 264.)

The plaintiff's condition was considerably improved by May 9, 2007, with her leg symptoms reduced and her back pain improved. (R. at 262.) Dr. Burrus wrote that she was ambulating better and was neurologically intact, and the plaintiff's back motion was improved. He concluded,

> I discussed with her I feel that she seems to be doing reasonably well. She may have some ongoing back pain. I think the best thing she can do is to address her weight issue. I feel she could try to go back to work in a more sedentary type role.

(*Id.*) This was apparently the plaintiff's last visit with Dr. Burrus. She testified that she returned to work the following month. (R. at 52.)

The plaintiff mentions x-rays from December 15, 2006, which Dr. Burrus explained showed her transitional lumbosacral segment at L5 and what appeared to be significant degenerative change at L5-S1. (R. at 214.) But Dr. Burrus had post-surgical x-rays taken on February 14, 2007, and these showed diffuse degenerative changes and the plaintiff's laminectomy defect; otherwise, the doctor saw nothing. (R. at 264.)

Further, the ALJ noted that the consultative examiner, orthopaedist Donald McQueen, found "no true measurable orthopaedic impairment." (R. at 13 (citing R. at 306).) When he examined the plaintiff, on April 28, 2008, she had 0-90 degrees of straight leg raising, sitting and supine, without any evidence of sciatic-type pain. (R. at 305.) The plaintiff had some discomfort with internal and external rotation of her hip, but she had no joint deformity, swelling or decreased motion. She could walk normally, with neither

obvious gait disturbance nor assistive device, although she was unable to squat. The plaintiff exhibited no measurable gross muscle weakness or sensory deficit. Overall, contrary to the plaintiff's assertion, the ALJ *did* cite to evidence to support his weighting of Dr. Hughes's opinion.

The plaintiff accuses the ALJ of ignoring her complaints of continuing pain, but he noted that, on her last visit with Dr. Burrus, "she had some ongoing back pain." (R. at 12.) The ALJ also took note of the plaintiff's representation to Dr. McQueen of "persistent pain." (R. at 13.) He further acknowledged her testimony that standing gives her back pain. (R. at 12.) Thus, the ALJ did not "completely ignore[]" all of the plaintiff's post-surgery complaints, as she contends. (Pl.'s Br. 30.)

> [T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, as was not the case here, is not a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole."

*Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (citation omitted); *see also Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). Such evidence as the ALJ discussed convinces the Court that he was aware of the extent of the plaintiff's complaints.

The plaintiff argues that Dr. Hughes's opinion should be adopted because "there was no contradictory examining or treating opinion evidence." (Pl.'s Br. 32.) She dismisses Dr. Burrus's suggestion that she return to sedentary work[16] because it was "much earlier in the record" (*id.*), but the Court believes she is much too blithe in so doing. Dr. Burrus's colleague described him as a "spine specialist[]" (R. at 215); there is no indication that Dr. Hughes is anything other than a general practitioner. *See* 20 C.F.R. §§ 404.1527(d)(5),

---

[16] The plaintiff testified that she attempted "a sitting job," but had to discontinue because of pain. (R. at 52-53.) There is no evidence, however, that the plaintiff was afforded a sit/stand option at that time.

416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty[.]").

The transcript contains medical records showing Dr. Hughes treated the plaintiff on four occasions from August 2008 through December 2008. Dr. Burrus's records date from the plaintiff's hospitalization on December 15, 2006, for intractable pain (*see* R. at 268), through her surgery, post-operative care and physical therapy, which apparently ended with her May 9th visit[17] (*see generally* R. 211-24; 262-85). *See* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Moreover, Dr. Burrus treated the plaintiff exclusively and extensively for her lumbar spine issues, while Dr. Hughes's treatment centered on the plaintiff's diabetes and even hypertension. There is no showing that Dr. Hughes did anything to treat the plaintiff's back pain other than refer her to physical therapy. *See id.* §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided[.]"). And because Dr. Hughes, the spine specialist, treated the plaintiff's lumbar impairment so extensively, it is his records that contain evidence relevant to the plaintiff's back pain. *See id.* §§ 404.1527(d)(3), 416.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

---

[17] At her physical therapy appointment the previous day, it was noted that the plaintiff's pain ranged from 0 to 5 on a 10-point scale. (R. at 281.) Her pain was increased that day because, in getting ready for a yard sale, she had done too much. The plaintiff reported "80% improvement" during her physical therapy course, although she was still limited in "prolonged" walking and standing; she did not complain of a limitation in sitting. (*Id.*)

Additionally, in making her contradictory evidence argument, the plaintiff ignores the ALJ's decision to accord "greater weight" to the opinion of the state agency medical consultants who found that the plaintiff retained the RFC to perform substantial gainful activity. (*See* R. at 13, 292, 310.) *See also* 20 CFR §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (providing that ALJs "must consider findings of State agency medical and psychological consultants ... as opinion evidence"). The Fourth Circuit has

> ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record. *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971). Furthermore, if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

*Smith v. Schweiker* 795 F.2d 343, 346 (4th Cir. 1986). *See also* SSR 96-6p, 61 Fed. Reg. 34,466-01, 34,468 ("In appropriate circumstances, opinions from State agency medical and psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources."). The Court finds that the plaintiff has alleged no reversible error in the ALJ's weighing of Dr. Hughes's opinion.

## III. Credibility

The plaintiff complains that the ALJ erred in not explaining why he found that her statements "concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not credible to the extent they are inconsistent with" his RFC finding. (R. at 12.) As an initial matter, federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of symptoms in disability determinations. *See Craig*, 76 F.3d at 593. Under the regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, "there must be objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 591 (quotation and emphasis omitted). This threshold test "does not . . .

entail a determination of the 'intensity, persistence, or functionally limiting effect' of the claimant's asserted pain." *Id.* at 594 (citation omitted). Second, and only after the threshold inquiry has been satisfied, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." *Id.* at 595. When the ALJ fails to "expressly consider the threshold question" and instead proceeds "directly to considering the credibility of [the] subjective allegations," remand is warranted. *Id*. at 596.

It is critical to proceed through the steps in order, because "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain." *Id.* at 593. In other words, once an ALJ concludes that an impairment could reasonably be expected to produce the pain alleged, she ought to view any inconsistency or defect in the plaintiff's subjective testimony through a more discriminating lens because the plaintiff's subjective allegations, at that point, are consistent with the objective expectations.

The plaintiff's argument quotes narrative requirements from Ruling 96-7p, 61 Fed. Reg. 34,483-01:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

*Id.* at 34,485-86. She accuses the ALJ of doing exactly what the Ruling proscribes by merely stating that she is not credible and not providing any analysis.

The plaintiff, however, simply ignores the ALJ's explanation. In the paragraph following his credibility finding, the ALJ addresses the plaintiff's complaints of back and leg pain. (R. at 12.) He referred first to her 2006 surgery and then to her post-operative medical records which document the improvement, although not complete resolution, of her complaints. The ALJ cited to Dr. Burrus's assessment that the plaintiff was doing reasonably well despite her ongoing back pain, and his suggestion that she attempt more sedentary work.

As to the plaintiff's diabetes mellitus, the ALJ observed that there was no evidence of end organ damage. (R. at 13.) The ALJ added that the plaintiff reported that she was doing well on her psychiatric medication and she had been discharged from mental health care. Although the ALJ might have been more exhaustive in his analysis, he did not fail to provide any at all.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, this Court concludes that the findings of the ALJ are supported by substantial evidence and recommends that the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.


S/Bruce H Hendricks
BRUCE H. HENDRICKS
UNITED STATES MAGISTRATE JUDGE

June 16, 2010
Greenville, South Carolina